(Slip Opinion)     OCTOBER TERM, 2011     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS *v.* PATCHAK ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 11–246.   Argued April 24, 2012—Decided June 18, 2012*

The Indian Reorganization Act (IRA) authorizes the Secretary of the Interior to acquire property "for the purpose of providing land to Indians."   25 U. S. C. §465.   Petitioner Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Band), an Indian tribe federally recognized in 1999, requested that the Secretary take into trust on its behalf a tract of land known as the Bradley Property, which the Band intended to use "for gaming purposes."   The Secretary took title to the Bradley Property in 2009.   Respondent David Patchak, who lives near the Bradley Property, filed suit under the Administrative Procedure Act (APA), asserting that §465 did not authorize the Secretary to acquire the property because the Band was not a federally recognized tribe when the IRA was enacted in 1934.   Patchak alleged a variety of economic, environmental, and aesthetic harms as a result of the Band's proposed use of the property to operate a casino, and requested injunctive and declaratory relief reversing the Secretary's decision to take title to the land.   The Band intervened to defend the Secretary's decision.   The District Court did not reach the merits of Patchak's suit, but ruled that he lacked prudential standing to challenge the Secretary's acquisition of the Bradley Property.   The D. C. Circuit reversed and also rejected the Secretary's and the Band's alternative argument that sovereign immunity barred the suit.

*Held*:

1. The United States has waived its sovereign immunity from

———————

*Together with No. 11–247, *Salazar, Secretary of the Interior, et al.* v. *Patchak et al.,* also on certiorari to the same court.

Patchak's action.  The APA's general waiver of the Federal Govern-
ment's immunity from suit does not apply "if any other statute that
grants consent to suit expressly or impliedly forbids the relief which
is sought" by the plaintiff.  5 U. S. C. §702.  The Government and
Band contend that the Quiet Title Act (QTA) is such a statute.  The
QTA authorizes (and so waives the Government's sovereign immuni-
ty from) a suit by a plaintiff asserting a "right, title, or interest" in
real property that conflicts with a "right, title, or interest" the United
States claims.  28 U. S. C. §2409a(d).  But it contains an exception for
"trust or restricted Indian lands."  §2409a(a).

To determine whether the "Indian lands" exception bars Patchak's
suit, the Court considers whether the QTA addresses the kind of
grievance Patchak advances.  It does not, because Patchak's action is
not a quiet title action.  The QTA, from its title to its jurisdictional
grant to its venue provision, speaks specifically and repeatedly of
"quiet title" actions, a term universally understood to refer to suits in
which a plaintiff not only challenges someone else's claim, but also
asserts his own right to disputed property.  Although Patchak's suit
contests the Secretary's title, it does not claim any competing interest
in the Bradley Property.

Contrary to the argument of the Band and Government, the QTA
does not more broadly encompass any "civil action . . . to adjudicate a
disputed title to real property in which the United States claims an
interest."  §2409(a).  Rather, §2409a includes a host of indications
that the "civil action" at issue is an ordinary quiet title suit.  The
Band and Government also contend that the QTA's specific authori-
zation of adverse claimants' suits creates the negative implication
that non-claimants like Patchak cannot challenge Government own-
ership of land under any statute.  That argument is faulty for the
reason already given: Patchak is bringing a different claim, seeking
different relief, from the kind the QTA addresses.  Finally, the Band
and Government argue that Patchak's suit should be treated the
same as an adverse claimant's because both equally implicate the
"Indian lands" exception's policies.  That argument must be ad-
dressed to Congress.  The "Indian lands" exception reflects Congress's
judgment about how far to allow quiet title suits—not all suits chal-
lenging the Government's ownership of property.  Pp. 4−14.

2. Patchak has prudential standing to challenge the Secretary's ac-
quisition.  A person suing under the APA must assert an interest
that is "arguably within the zone of interests to be protected or regu-
lated by the statute" that he says was violated.  *Association of Data
Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150, 153.
The Government and Band claim that Patchak's economic, environ-
mental, and aesthetic injuries are not within §465's zone of interests

because the statute focuses on land acquisition, while Patchak's injuries relate to the land's use as a casino. However, §465 has far more to do with land use than the Government and Band acknowledge. Section 465 is the capstone of the IRA's land provisions, and functions as a primary mechanism to foster Indian tribes' economic development. The Secretary thus takes title to properties with an eye toward how tribes will use those lands to support such development. The Department's regulations make this statutory concern with land use clear, requiring the Secretary to acquire land with its eventual use in mind, after assessing potential conflicts that use might create. And because §465 encompasses land's use, neighbors to the use (like Patchak) are reasonable—indeed, predictable—challengers of the Secretary's decisions: Their interests, whether economic, environmental, or aesthetic, come within §465's regulatory ambit. Pp. 14–18.

632 F. 3d 702, affirmed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, and ALITO, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 11–246 and 11–247

## MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS, PETITIONER

11–246          *v.*

### DAVID PATCHAK ET AL.

## KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS

11–247          *v.*

### DAVID PATCHAK ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 18, 2012]

JUSTICE KAGAN delivered the opinion of the Court.

A provision of the Indian Reorganization Act (IRA), 25 U. S. C. §465, authorizes the Secretary of the Interior (Secretary) to acquire property "for the purpose of providing land for Indians." Ch. 576, §5, 48 Stat. 985. The Secretary here acquired land in trust for an Indian tribe seeking to open a casino. Respondent David Patchak lives near that land and challenges the Secretary's decision in a suit brought under the Administrative Procedure Act (APA), 5 U. S. C. §701 *et seq*. Patchak claims that the Secretary lacked authority under §465 to take title to the land, and alleges economic, environmental, and aesthetic harms from the casino's operation.

We consider two questions arising from Patchak's ac-

tion. The first is whether the United States has sovereign immunity from the suit by virtue of the Quiet Title Act (QTA), 86 Stat. 1176. We think it does not. The second is whether Patchak has prudential standing to challenge the Secretary's acquisition. We think he does. We therefore hold that Patchak's suit may proceed.

I

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Band) is an Indian tribe residing in rural Michigan. Although the Band has a long history, the Department of the Interior (DOI) formally recognized it only in 1999. See 63 Fed. Reg. 56936 (1998). Two years later, the Band petitioned the Secretary to exercise her authority under §465 by taking into trust a tract of land in Wayland Township, Michigan, known as the Bradley Property. The Band's application explained that the Band would use the property "for gaming purposes," with the goal of generating the "revenue necessary to promote tribal economic development, self-sufficiency and a strong tribal government capable of providing its members with sorely needed social and educational programs." App. 52, 41.[1]

In 2005, after a lengthy administrative review, the Secretary announced her decision to acquire the Bradley Property in trust for the Band. See 70 Fed. Reg. 25596. In accordance with applicable regulations, the Secretary committed to wait 30 days before taking action, so that interested parties could seek judicial review. See *ibid.*; 25 CFR §151.12(b) (2011). Within that window, an organization called Michigan Gambling Opposition (or MichGO)

_____

[1] Under the Indian Gaming Regulatory Act, 25 U. S. C. §§2701–2721, an Indian tribe may conduct gaming operations on "Indian lands," §2710, which include lands "held in trust by the United States for the benefit of any Indian tribe," §2703(4)(B). The application thus requested the Secretary to take the action necessary for the Band to open a casino.

filed suit alleging that the Secretary's decision violated environmental and gaming statutes. The Secretary held off taking title to the property while that litigation proceeded. Within the next few years, a District Court and the D. C. Circuit rejected MichGO's claims. See *Michigan Gambling Opposition* v. *Kempthorne*, 525 F. 3d 23, 27–28 (CADC 2008); *Michigan Gambling Opposition* v. *Norton*, 477 F. Supp. 2d 1 (DC 2007).

Shortly after the D. C. Circuit ruled against MichGO (but still before the Secretary took title), Patchak filed this suit under the APA advancing a different legal theory. He asserted that §465 did not authorize the Secretary to acquire property for the Band because it was not a federally recognized tribe when the IRA was enacted in 1934. See App. 37. To establish his standing to bring suit, Patchak contended that he lived "in close proximity to" the Bradley Property and that a casino there would "destroy the lifestyle he has enjoyed" by causing "increased traffic," "increased crime," "decreased property values," "an irreversible change in the rural character of the area," and "other aesthetic, socioeconomic, and environmental problems." *Id.,* at 30–31. Notably, Patchak did not assert any claim of his own to the Bradley Property. He requested only a declaration that the decision to acquire the land violated the IRA and an injunction to stop the Secretary from accepting title. See *id.,* at 38–39. The Band intervened in the suit to defend the Secretary's decision.

In January 2009, about five months after Patchak filed suit, this Court denied certiorari in MichGO's case, 555 U. S. 1137, and the Secretary took the Bradley Property into trust. That action mooted Patchak's request for an injunction to prevent the acquisition, and all parties agree that the suit now effectively seeks to divest the Federal Government of title to the land. See Brief for Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians 17 (hereinafter Tribal Petitioner); Brief for Federal Petitioners 11;

Brief for Respondent 24–25.  The month after the Government took title, this Court held in *Carcieri* v. *Salazar*, 555 U. S. 379, 382 (2009), that §465 authorizes the Secretary to take land into trust only for tribes that were "under federal jurisdiction" in 1934.[2]

The District Court dismissed the suit without considering the merits (including the relevance of *Carcieri*), ruling that Patchak lacked prudential standing to challenge the Secretary's acquisition of the Bradley Property.  The court reasoned that the injuries Patchak alleged fell outside §465's "zone of interests."  646 F. Supp. 2d 72, 76 (DC 2009).  The D. C. Circuit reversed that determination.  See 632 F. 3d 702, 704–707 (2011).  The court also rejected the Secretary's and the Band's alternative argument that by virtue of the QTA, sovereign immunity barred the suit.  See *id.,* at 707–712.  The latter ruling conflicted with decisions of three Circuits holding that the United States has immunity from suits like Patchak's.  See *Neighbors for Rational Development, Inc.* v. *Norton,* 379 F. 3d 956, 961–962 (CA10 2004); *Metropolitan Water Dist. of Southern Cal.* v. *United States,* 830 F. 2d 139, 143–144 (CA9 1987) *(per curiam)*; *Florida Dept. of Bus. Regulation* v. *Department of Interior,* 768 F. 2d 1248, 1253–1255 (CA11 1985).  We granted certiorari to review both of the D. C. Circuit's holdings, 565 U. S. ___ (2011), and we now affirm.

## II

We begin by considering whether the United States' sovereign immunity bars Patchak's suit under the APA.

---

[2] The merits of Patchak's case are not before this Court.  We therefore express no view on whether the Band was "under federal jurisdiction" in 1934, as *Carcieri* requires.  Nor do we consider how that question relates to Patchak's allegation that the Band was not "federally recognized" at the time.  Cf. *Carcieri,* 555 U. S., at 397–399 (BREYER, J., concurring) (discussing this issue).

That requires us first to look to the APA itself and then, for reasons we will describe, to the QTA. We conclude that the United States has waived its sovereign immunity from Patchak's action.

The APA generally waives the Federal Government's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U. S. C. §702. That waiver would appear to cover Patchak's suit, which objects to official action of the Secretary and seeks only non-monetary relief. But the APA's waiver of immunity comes with an important carve-out: The waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought" by the plaintiff. *Ibid.* That provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes. The question thus becomes whether another statute bars Patchak's demand for relief.

The Government and Band contend that the QTA does so. The QTA authorizes (and so waives the Government's sovereign immunity from) a particular type of action, known as a quiet title suit: a suit by a plaintiff asserting a "right, title, or interest" in real property that conflicts with a "right, title, or interest" the United States claims. 28 U. S. C. §2409a(d). The statute, however, contains an exception: The QTA's authorization of suit "does not apply to trust or restricted Indian lands." §2409a(a). According to the Government and Band, that limitation on quiet title suits satisfies the APA's carve-out and so forbids Patchak's suit. In the Band's words, the QTA exception retains "the United States' full immunity from suits seeking to challenge its title to or impair its legal interest in Indian trust lands." Brief for Tribal Petitioner 18.

Two hypothetical examples might help to frame consid-

eration of this argument.  First, suppose Patchak had sued under the APA claiming that *he* owned the Bradley Property and that the Secretary therefore could not take it into trust.  The QTA would bar that suit, for reasons just suggested.  True, it fits within the APA's general waiver, but the QTA specifically authorizes quiet title actions (which this hypothetical suit is) *except when* they involve Indian lands (which this hypothetical suit does).  In such a circumstance, a plaintiff cannot use the APA to end-run the QTA's limitations.  "[W]hen Congress has dealt in particularity with a claim and [has] intended a specified remedy"—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment. *Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U. S. 273, 286, n. 22 (1983) (quoting H. R. Rep. No. 94–1656, p. 13 (1976)).

But now suppose that Patchak had sued under the APA claiming only that use of the Bradley Property was causing environmental harm, and raising no objection at all to the Secretary's title.  The QTA could not bar that suit because even though involving Indian lands, it asserts a grievance altogether different from the kind the statute concerns.  JUSTICE SCALIA, in a former life as Assistant Attorney General, made this precise point in a letter to Congress about the APA's waiver of immunity (which we hasten to add, given the author, we use not as legislative history, but only for its persuasive force).  When a statute "is not addressed to the type of grievance which the plaintiff seeks to assert," then the statute cannot prevent an APA suit.  *Id.,* at 28 (May 10, 1976, letter of Assistant Atty. Gen. A. Scalia).[3]

--------

[3] According to the dissent, we should look only to the kind of relief a plaintiff seeks, rather than the type of grievance he asserts, in deciding whether another statute bars an APA action.  See *post*, at 6 (opinion of SOTOMAYOR, J.).  But the dissent's test is inconsistent with the one we adopted in *Block*, which asked whether Congress had particularly dealt

We think that principle controls Patchak's case: The QTA's "Indian lands" clause does not render the Government immune because the QTA addresses a kind of grievance different from the one Patchak advances. As we will explain, the QTA—whose full name, recall, is the Quiet Title Act—concerns (no great surprise) quiet title actions. And Patchak's suit is *not* a quiet title action, because although it contests the Secretary's title, it does not claim any competing interest in the Bradley Property. That fact makes the QTA's "Indian lands" limitation simply inapposite to this litigation.

In reaching this conclusion, we need look no further than the QTA's text. From its title to its jurisdictional grant to its venue provision, the Act speaks specifically and repeatedly of "quiet title" actions. See 86 Stat. 1176 ("An Act [t]o permit suits to adjudicate certain real property quiet title actions"); 28 U. S. C. §1346(f) (giving district courts jurisdiction over "civil actions . . . to quiet title" to property in which the United States claims an interest); §1402(d) (setting forth venue for "[a]ny civil action . . . to quiet title" to property in which the United States claims an interest). That term is universally understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property. See, *e.g.,* Black's Law Dictionary 34 (9th ed. 2009) (defining an "*action to quiet title*" as "[a] proceeding

————————

with a "claim." See *Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U. S. 273, 286, n. 22 (1983). And the dissent's approach has no obvious limits. Suppose, for example, that Congress passed a statute authorizing a particular form of injunctive relief in a procurement contract suit except when the suit involved a "discretionary function" of a federal employee. Cf. 28 U. S. C. §2680(a). Under the dissent's method, that exception would preclude *any* APA suit seeking that kind of injunctive relief if it involved a discretionary function, no matter what the nature of the claim. That implausible result demonstrates that limitations on relief cannot sensibly be understood apart from the claims to which they attach.

to establish a plaintiff's title to land by compelling the
adverse claimant to establish a claim or be forever es-
topped from asserting it"); *Grable & Sons Metal Products,
Inc.* v. *Darue Engineering & Mfg.*, 545 U. S. 308, 315
(2005) ("[T]he facts showing the plaintiffs' title . . . are
essential parts of the plaintiffs' [quiet title] cause of ac-
tion" (quoting *Hopkins* v. *Walker*, 244 U. S. 486, 490
(1917))).

And the QTA's other provisions make clear that the
recurrent statutory term "quiet title action" carries its or-
dinary meaning. The QTA directs that the complaint in
such an action "shall set forth with particularity the na-
ture of the right, title, or interest which the plaintiff
claims in the real property." 28 U. S. C. §2409a(d). If the
plaintiff does not assert any such right (as Patchak does
not), the statute cannot come into play.[4] Further, the QTA
provides an option for the United States, if it loses the
suit, to pay "just compensation," rather than return the
property, to the "person determined to be entitled" to it.
§2409a(b). That provision makes perfect sense in a quiet
title action: If the plaintiff is found to own the property,
the Government can satisfy his claim through an award of
money (while still retaining the land for its operations).
But the provision makes no sense in a suit like this one,

---

[4] The dissent contends that the QTA omits two other historical re-
quirements for quiet title suits. See *post*, at 8. But many States had
abandoned those requirements by the time the QTA was passed. See
S. Rep. No. 92–575, p. 6 (1971) (noting "wide differences in State
statutory and decisional law" on quiet title suits); Steadman, "Forgive
the U. S. Its Trespasses?": Land Title Disputes With the Sovereign—
Present Remedies and Prospective Reforms, 1972 Duke L. J. 15, 48–49,
and n. 152 (stating that cases had disputed whether a quiet title
plaintiff needed to possess the land); *Welch* v. *Kai*, 4 Cal. App. 3d 374,
380–381, 84 Cal. Rptr. 619, 622–623 (1970) (allowing a quiet title action
when the plaintiff claimed only an easement); *Benson* v. *Fekete*, 424
S. W. 2d 729 (Mo. 1968) (en banc) (same). So Congress in enacting the
QTA essentially chose one contemporaneous form of quiet title action.

where Patchak does not assert a right to the property. If the United States loses the suit, an award of just compensation to the rightful owner (whoever and wherever he might be) could do nothing to satisfy Patchak's claim.[5]

In two prior cases, we likewise described the QTA as addressing suits in which the plaintiff asserts an ownership interest in Government-held property. In *Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U. S. 273 (1982), we considered North Dakota's claim to land that the United States viewed as its own. We held that the State could not circumvent the QTA's statute of limitations by invoking other causes of action, among them the APA. See *id.,* at 277–278, 286, n. 22. The crux of our reasoning was that Congress had enacted the QTA to address exactly the kind of suit North Dakota had brought. Prior to the QTA, we explained, "citizens asserting title to or the right to possession of lands claimed by the United States" had no recourse; by passing the statute, "Congress sought to rectify this state of affairs." *Id.,* at 282. Our decision reflected that legislative purpose: Congress, we held, "intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Id.,* at 286.

———————

[5] The legislative history, for those who think it useful, further shows that the QTA addresses quiet title actions, as ordinarily conceived. The Senate Report states that the QTA aimed to alleviate the "[g]rave inequity" to private parties "excluded, without benefit of a recourse to the courts, from lands they have reason to believe are rightfully theirs." S. Rep. No. 92–575, at 1. Similarly, the House Report notes that the history of quiet title actions "goes back to the Courts of England," and provided as examples "a plaintiff whose title to land was continually being subjected to litigation in the law courts," and "one who feared that an outstanding deed or other interest might cause a claim to be presented in the future." H. R. Rep. No. 92–1559, p. 6 (1972). From top to bottom, these reports show that Congress thought itself to be authorizing bread-and-butter quiet title actions, in which a plaintiff asserts a right, title, or interest of his own in disputed land.

We repeat: "adverse claimants," meaning plaintiffs who themselves assert a claim to property antagonistic to the Federal Government's.

Our decision in *United States* v. *Mottaz*, 476 U. S. 834 (1986), is of a piece. There, we considered whether the QTA, or instead the Tucker Act or General Allotment Act, governed the plaintiff's suit respecting certain allotments of land held by the United States. We thought the QTA the relevant statute because the plaintiff herself asserted title to the property. Our opinion quoted the plaintiff's own description of her suit: "At no time in this proceeding did [the plaintiff] drop her claim for title. To the contrary, the claim for title is the essence and bottom line of [the plaintiff's] case." *Id.,* at 842 (quoting Brief for Respondent in *Mottaz*, O. T. 1985, No. 546, p. 3). That fact, we held, brought the suit "within the [QTA's] scope": "What [the plaintiff] seeks is a declaration that she alone possesses valid title." 476 U. S., at 842. So once again, we construed the QTA as addressing suits by adverse claimants.

But Patchak is not an adverse claimant—and so the QTA (more specifically, its reservation of sovereign immunity from actions respecting Indian trust lands) cannot bar his suit. Patchak does not contend that he owns the Bradley Property, nor does he seek any relief corresponding to such a claim. He wants a court to strip the United States of title to the land, but not on the ground that it is his and not so that he can possess it. Patchak's lawsuit therefore lacks a defining feature of a QTA action. He is not trying to disguise a QTA suit as an APA action to circumvent the QTA's "Indian lands" exception. Rather, he is not bringing a QTA suit at all. He asserts merely that the Secretary's decision to take land into trust violates a federal statute—a garden-variety APA claim. See 5 U. S. C. §§706(2)(A), (C) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law [or] in excess of statutory jurisdiction

[or] authority"). Because that is true—because in then-Assistant Attorney General Scalia's words, the QTA is "not addressed to the type of grievance which [Patchak] seeks to assert," H. R. Rep. 94–1656, at 28—the QTA's limitation of remedies has no bearing. The APA's general waiver of sovereign immunity instead applies.

The Band and Government, along with the dissent, object to this conclusion on three basic grounds. First, they contend that the QTA speaks more broadly than we have indicated, waiving immunity from suits "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U. S. C. §2409a(a). That language, the argument goes, encompasses all actions contesting the Government's legal interest in land, regardless whether the plaintiff claims ownership himself. See Brief for Federal Petitioners 19–20; Reply Brief for Tribal Petitioner 4–6; *post*, at 8–9 (SOTOMAYOR, J., dissenting). The QTA (not the APA) thus becomes the relevant statute after all—as to both its waiver and its "corresponding" reservation of immunity from suits involving Indian lands. Reply Brief for Tribal Petitioner 6.

But the Band and Government can reach that result only by neglecting key words in the relevant provision. That sentence, more fully quoted, reads: "The United States may be named as a party defendant in *a civil action under this section* to adjudicate a disputed title to real property in which the United States claims an interest." §2409a(a) (emphasis added). And as we have already noted, "this section"—§2409a—includes a host of indications that the "civil action" at issue is an ordinary quiet title suit: Just recall the section's title ("Real property quiet title actions"), and its pleading requirements (the plaintiff "shall set forth with particularity the nature of the right, title, or interest which [he] claims"), and its permission to the Government to remedy an infraction by paying "just compensation." Read with reference to all

these provisions (as well as to the QTA's contemporane
ously enacted jurisdictional and venue sections), the waiver
clause rebuts, rather than supports, the Band's and the
Government's argument: That clause speaks not to any
suit in which a plaintiff challenges the Government's title,
but only to an action in which the plaintiff also claims an
interest in the property.

The Band and Government next invoke cases holding
that "when a statute provides a detailed mechanism for
judicial consideration of particular issues at the behest of
particular persons," the statute may "impliedly preclude[]"
judicial review "of those issues at the behest of other
persons." *Block* v. *Community Nutrition Institute*, 467
U. S. 340, 349 (1984); see *United States* v. *Fausto*, 484
U. S. 439, 455 (1988). Here, the Band and Government
contend, the QTA's specific authorization of adverse
claimants' suits creates a negative implication: *non*-
adverse claimants like Patchak cannot challenge Govern-
ment ownership of land under any other statute. See
Reply Brief for Tribal Petitoner 7–10; Reply Brief for
Federal Petitioners 7–9; see also *post*, at 3–4. The QTA,
says the Band, thus "preempts [Patchak's] more general
remedies." Brief for Tribal Petitioner 23 (internal quota-
tion marks omitted).

But we think that argument faulty, and the cited cases
inapposite, for the reason already given: Patchak is bring-
ing a different claim, seeking different relief, from the
kind the QTA addresses. See *supra,* at 7–10. To see the
point, consider a contrasting example. Suppose the QTA
authorized suit only by adverse claimants who could
assert a property interest of at least a decade's duration.
Then suppose an adverse claimant failing to meet that
requirement (because, say, his claim to title went back
only five years) brought suit under a general statute like
the APA. We would surely bar that suit, citing the cases
the Government and Band rely on; in our imaginary stat-

ute, Congress delineated the class of persons who could bring a quiet title suit, and that judgment would preclude others from doing so. But here, once again, Patchak is not bringing a quiet title action at all. He is not claiming to own the property, and he is not demanding that the court transfer the property to him. So to succeed in their argument, the Government and Band must go much further than the cited cases: They must say that in authorizing one person to bring one kind of suit seeking one form of relief, Congress barred another person from bringing another kind of suit seeking another form of relief. Presumably, that contention would extend only to suits involving similar subject matter—*i.e.,* the Government's ownership of property. But that commonality is not itself sufficient. We have never held, and see no cause to hold here, that some general similarity of subject matter can alone trigger a remedial statute's preclusive effect.

Last, the Band and Government argue that we should treat Patchak's suit as we would an adverse claimant's because they equally implicate the "Indian lands" exception's policies. According to the Government, allowing challenges to the Secretary's trust acquisitions would "pose significant barriers to tribes['] . . . ability to promote investment and economic development on the lands." Brief for Federal Petitioners 24. That harm is the same whether or not a plaintiff claims to own the land himself. Indeed, the Band argues that the sole difference in this suit cuts in its direction, because non-adverse claimants like Patchak have "the most remote injuries and indirect interests in the land." Brief for Tribal Petitioner 13; see Reply Brief for Federal Petitioners 11–12; see also *post*, at 2, 7, 10.[6]

——————

[6] In a related vein, the dissent argues that our holding will undermine the QTA's "Indian lands" exception by allowing adverse claimants to file APA complaints concealing their ownership interests or to recruit

That argument is not without force, but it must be
addressed to Congress.  In the QTA, Congress made a
judgment about how far to allow quiet title suits—to a
point, but no further.  (The "no further" includes not only
the "Indian lands" exception, but one for security interests
and water rights, as well as a statute of limitations, a bar
on jury trials, jurisdictional and venue constraints, and
the just compensation option discussed earlier.)  Perhaps
Congress would—perhaps Congress should—make the
identical judgment for the full range of lawsuits pertaining
to the Government's ownership of land.  But that is not
our call.  The Band assumes that plaintiffs like Patchak
have a lesser interest than those bringing quiet title ac-
tions, and so should be precluded *a fortiori*.  But all we can
say is that Patchak has a different interest.  Whether it is
lesser, as the Band argues, because not based on property
rights; whether it is greater because implicating public
interests; or whether it is in the end exactly the same—
that is for Congress to tell us, not for us to tell Congress.
As the matter stands, Congress has not assimilated to
quiet title actions all other suits challenging the Govern-
ment's ownership of property.  And so when a plaintiff like
Patchak brings a suit like this one, it falls within the
APA's general waiver of sovereign immunity.

### III

We finally consider the Band's and the Government's
alternative argument that Patchak cannot bring this ac-
tion because he lacks prudential standing.  This Court
has long held that a person suing under the APA must
satisfy not only Article III's standing requirements, but an

---

third parties to bring suit on their behalf.  See *post*, at 9–11.  But we
think that concern more imaginary than real.  We have trouble conceiv-
ing of a plausible APA suit that omits mention of an adverse claimant's
interest in property yet somehow leads to relief recognizing that very
interest.

additional test: The interest he asserts must be "arguably within the zone of interests to be protected or regulated by the statute" that he says was violated. *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 153 (1970). Here, Patchak asserts that in taking title to the Bradley Property, the Secretary exceeded her authority under §465, which authorizes the acquisition of property "for the purpose of providing land for Indians." And he alleges that this statutory violation will cause him economic, environmental, and aesthetic harm as a nearby property owner. See *supra,* at 3. The Government and Band argue that the relationship between §465 and Patchak's asserted interests is insufficient. That is so, they contend, because the statute focuses on land *acquisition*, whereas Patchak's interests relate to the land's *use* as a casino. See Brief for Tribal Petitioner 46 ("The Secretary's decision to put land into trust does not turn on any particular use of the land, gaming or otherwise[,] . . . [and] thus has no impact on [Patchak] or his asserted interests"); Brief for Federal Petitioners 34 ("[L]and may be taken into trust for a host of purposes that have nothing at all to do with gaming"). We find this argument unpersuasive.

The prudential standing test Patchak must meet "is not meant to be especially demanding." *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388, 399 (1987). We apply the test in keeping with Congress's "evident intent" when enacting the APA "to make agency action presumptively reviewable." *Ibid.* We do not require any "indication of congressional purpose to benefit the would-be plaintiff." *Id.,* at 399–400.[7] And we have always conspicuously

_____

[7] For this reason, the Band's statement that Patchak is "not an Indian or tribal official seeking land" and does not "claim an interest in advancing tribal development," Brief for Tribal Petitioner 42, is beside the point. The question is not whether §465 seeks to benefit Patchak; everyone can agree it does not. The question is instead, as the Band's

included the word "arguably" in the test to indicate that
the benefit of any doubt goes to the plaintiff. The test
forecloses suit only when a plaintiff's "interests are so
marginally related to or inconsistent with the purposes
implicit in the statute that it cannot reasonably be as-
sumed that Congress intended to permit the suit." *Id.*,
at 399.

Patchak's suit satisfies that standard, because §465 has
far more to do with land use than the Government and
Band acknowledge. Start with what we and others have
said about §465's context and purpose. As the leading
treatise on federal Indian law notes, §465 is "the capstone"
of the IRA's land provisions. F. Cohen, Handbook of Fed-
eral Indian Law §15.07[1][a], p. 1010 (2005 ed.) (hereinaf-
ter Cohen). And those provisions play a key role in the
IRA's overall effort "to rehabilitate the Indian's economic
life," *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 152
(1973) (internal quotation marks omitted). "Land forms
the basis" of that "economic life," providing the foundation
for "tourism, manufacturing, mining, logging, . . . and
gaming." Cohen §15.01, at 965. Section 465 thus func-
tions as a primary mechanism to foster Indian tribes'
economic development. As the D. C. Circuit explained in
the *MichGO* litigation, the section "provid[es] lands suffi-
cient to enable Indians to achieve self-support." *Michigan
Gambling*, 525 F. 3d, at 31 (internal quotation marks
omitted); see *Morton* v. *Mancari*, 417 U. S. 535, 542 (1974)
(noting the IRA's economic aspect). So when the Secretary
obtains land for Indians under §465, she does not do so in
a vacuum. Rather, she takes title to properties with at
least one eye directed toward how tribes will use those

_____

and the Government's main argument acknowledges, whether issues of
land use (arguably) fall within §465's scope—because if they do, a
neighbor complaining about such use may sue to enforce the statute's
limits. See *infra* this page and 16–17.

lands to support economic development.

The Department's regulations make this statutory concern with land use crystal clear. Those regulations permit the Secretary to acquire land in trust under §465 if the "land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 CFR §151.3(a)(3). And they require the Secretary to consider, in evaluating any acquisition, both "[t]he purposes for which the land will be used" and the "potential conflicts of land use which may arise." §§151.10(c), 151.10(f); see §151.11(a). For "off-reservation acquisitions" made "for business purposes"—like the Bradley Property— the regulations further provide that the tribe must "provide a plan which specifies the anticipated economic benefits associated with the proposed use." §151.11(c). DOI's regulations thus show that the statute's implementation centrally depends on the projected use of a given property.

The Secretary's acquisition of the Bradley Property is a case in point. The Band's application to the Secretary highlighted its plan to use the land for gaming purposes. See App. 41 ("[T]rust status for this Property is requested in order for the Tribe to acquire property on which it plans to conduct gaming"); *id.,* at 61–62 ("The Tribe intends to . . . renovate the existing . . . building into a gaming facility . . . . to offer Class II and/or Class III gaming"). Similarly, DOI's notice of intent to take the land into trust announced that the land would "be used for the purpose of construction and operation of a gaming facility," which the Department had already determined would meet the Indian Gaming Regulatory Act's requirements. 70 Fed. Reg. 25596; 25 U. S. C. §§2701–2721. So from start to finish, the decision whether to acquire the Bradley Property under §465 involved questions of land use.

And because §465's implementation encompasses these issues, the interests Patchak raises—at least arguably—

fall "within the zone . . . protected or regulated by the statute." If the Government had violated a statute specifically addressing how federal land can be used, no one would doubt that a neighboring landowner would have prudential standing to bring suit to enforce the statute's limits. The difference here, as the Government and Band point out, is that §465 specifically addresses only land acquisition. But for the reasons already given, decisions under the statute are closely enough and often enough entwined with considerations of land use to make that difference immaterial. As in this very case, the Secretary will typically acquire land with its eventual use in mind, after assessing potential conflicts that use might create. See 25 CFR §§151.10(c), 151.10(f), 151.11(a). And so neighbors to the use (like Patchak) are reasonable— indeed, predictable—challengers of the Secretary's decisions: Their interests, whether economic, environmental, or aesthetic, come within §465's regulatory ambit.

\* \* \*

The QTA's reservation of sovereign immunity does not bar Patchak's suit. Neither does the doctrine of prudential standing. We therefore affirm the judgment of the D. C. Circuit, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 11–246 and 11–247

_____

MATCH-E-BE-NASH-SHE-WISH BAND OF
POTTAWATOMI INDIANS, PETITIONER
11–246                 _v._
DAVID PATCHAK ET AL.


KEN L. SALAZAR, SECRETARY OF THE INTERIOR,
ET AL., PETITIONERS
11–247                 _v._

DAVID PATCHAK ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 18, 2012]

JUSTICE SOTOMAYOR, dissenting.

In enacting the Quiet Title Act (QTA), Congress waived
the Government's sovereign immunity in cases seeking "to
adjudicate a disputed title to real property in which the
United States claims an interest." 28 U. S. C. §2409a(a).
In so doing, Congress was careful to retain the Govern-
ment's sovereign immunity with respect to particular
claimants, particular categories of land, and particular
remedies. Congress and the Executive Branch considered
these "carefully crafted provisions" essential to the im-
munity waiver and "necessary for the protection of the
national public interest." _Block_ v. _North Dakota ex rel.
Board of Univ. and School Lands_, 461 U. S. 273, 284–285
(1983).

The Court's opinion sanctions an end-run around these
vital limitations on the Government's waiver of sovereign
immunity. After today, any person may sue under the

Administrative Procedure Act (APA) to divest the Federal
Government of title to and possession of land held in trust
for Indian tribes—relief expressly forbidden by the QTA—
so long as the complaint does not assert a personal inter-
est in the land. That outcome cannot be squared with the
APA's express admonition that it confers no "authority to
grant relief if any other statute that grants consent to suit
expressly or impliedly forbids the relief which is sought."
5 U. S. C. §702. The Court's holding not only creates
perverse incentives for private litigants, but also exposes
the Government's ownership of land to costly and pro-
longed challenges. Because I believe those results to be
inconsistent with the QTA and the APA, I respectfully
dissent.

## I

## A

Congress enacted the QTA to provide a comprehensive
solution to the problem of real-property disputes between
private parties and the United States. The QTA strikes a
careful balance between private parties' desire to adjudi-
cate such disputes, and the Government's desire to impose
"'appropriate safeguards'" on any waiver of sovereign
immunity to ensure "'the protection of the public inter-
est.'" *Block*, 461 U. S., at 282–283; see also S. Rep. No.
92–575, p. 6 (1971).

Section 2409a(a) provides expansively that "[t]he United
States may be named as a party defendant in a civil action
under this section to adjudicate a disputed title to real
property in which the United States claims an interest."
That language mirrors the title proposed by the Executive
Branch for the legislation that Congress largely adopted:
"A Bill To permit suits to adjudicate disputed titles to
lands in which the United States claims an interest." *Id.,*
at 7.

The remainder of the Act, however, imposes important

conditions upon the Government's waiver of sovereign im-
munity. First, the right to sue "does not apply to trust or
restricted Indian lands." §2409a(a). The Indian lands
exception reflects the view that "a waiver of immunity in
this area would not be consistent with specific commit-
ments [the Government] ha[s] made to the Indians
through treaties and other agreements." *Block*, 461 U. S.,
at 283 (internal quotation marks omitted). By exempting
Indian lands, Congress ensured that the Government's
"solemn obligations" to tribes would not be "abridg[ed] . . .
without the consent of the Indians." S. Rep. No. 92–575,
at 4.

Second, the Act preserves the United States' power to
retain possession or control of any disputed property, even
if a court determines that the Government's property
claim is invalid. To that end, §2409a(b) "allow[s] the
United States the option of paying money damages in-
stead of surrendering the property if it lost a case on the
merits." *Block*, 461 U. S., at 283. This provision was
considered essential to addressing the Government's
"main objection in the past to waiving sovereign immu-
nity" where federal land was concerned: that an adverse
judgment "would make possible decrees ousting the United
States from possession and thus interfer[e] with opera-
tions of the Government." S. Rep. No. 92–575, at 5–6.
Section 2409a(b) "eliminate[d] cause for such apprehen-
sion," by ensuring that—even under the QTA—the United
States could not be stripped of its possession or control of
property without its consent. *Id.,* at 6.

Finally, the Act limits the class of individuals permitted
to sue the Government to those claiming a "right, title, or
interest" in disputed property. §2409a(d). As we have
explained, Congress' decision to restrict the class entitled
to relief indicates that Congress precluded relief for the
remainder. See, *e.g., Block* v. *Community Nutrition Insti-
tute*, 467 U. S. 340, 349 (1984) ("[W]hen a statute provides

a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded"). That inference is especially strong here, because the QTA was "enacted against the backdrop of sovereign immunity." S. Rep. No. 94–996, p. 27 (1976). Section 2409a(d) thus indicates that Congress concluded that those without any "right, title, or interest" in a given property did not have an interest sufficient to warrant abrogation of the Government's sovereign immunity.

Congress considered these conditions indispensible to its immunity waiver.[1] "[W]hen Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." *Block*, 461 U. S., at 287. Congress and the Executive Branch intended the scheme to be the exclusive procedure for resolving property title disputes involving the United States. See *id.*, at 285 (describing Act as a "careful and thorough remedial scheme"); S. Rep. No. 92–575, at 4 (§2409a "provides a *complete*, thoughtful approach to the problem of disputed titles to federally claimed land" (emphasis added)).

For that reason, we held that Congress did not intend to create a "new supplemental remedy" when it enacted the APA's general waiver of sovereign immunity. *Block*, 461

——————

[1] As we explained in *Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U. S. 273, 282–283 (1983), Congress' initial proposal lacked such provisions. The Executive Branch, however, strongly opposed the original bill, explaining that it was "too broad and sweeping in scope and lacking adequate safeguards to protect the public interest." Dispute of Titles on Public Lands: Hearings on S. 216 et al. before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs, 92d Cong., 1st Sess., 21 (1971). Congress ultimately agreed, largely adopting the Executive's substitute bill. See *Block*, 461 U. S., at 283–284.

U. S., at 286, n. 22. "'It would require the suspension of disbelief,'" we reasoned, "'to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.'" *Id.*, at 285 (quoting *Brown* v. *GSA*, 425 U. S. 820, 833 (1976)). If a plaintiff could oust the Government of title to land by means of an APA action, "all of the carefully crafted provisions of the QTA deemed necessary for the protection of the national public interest could be averted," and the "Indian lands exception to the QTA would be rendered nugatory." *Block*, 461 U. S., at 284–285. We therefore had little difficulty concluding that Congress did not intend to render the QTA's limitations obsolete by affording any plaintiff the right to dispute the Government's title to any lands by way of an APA action—and to empower any such plaintiff to "disposses[s] [the United States] of the disputed property without being afforded the option of paying damages." *Id.,* at 285.

It is undisputed that Patchak does not meet the conditions to sue under the QTA. He seeks to challenge the Government's title to Indian trust land (strike one); he seeks to force the Government to relinquish possession and title outright, leaving it no alternative to pay compensation (strike two); and he does not claim any personal right, title, or interest in the property (strike three). Thus, by its express terms, the QTA forbids the relief Patchak seeks. Compare *ante,* at 3 ("[A]ll parties agree that the suit now effectively seeks to divest the Federal Government of title to the [Indian trust] land"), with *United States* v. *Mottaz*, 476 U. S. 834, 842 (1986) (Section 2409a(a)'s Indian lands exclusion "operates solely to retain the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians"). Consequently, Patchak may not avoid the QTA's constraints by suing under the APA, a statute enacted only four years later. See 5 U. S. C. §702 (render-

ing the APA's waiver of sovereign immunity inapplicable
"if any other statute that grants consent to suit expressly
or impliedly forbids the relief which is sought").

B

The majority nonetheless permits Patchak to circum-
vent the QTA's limitations by filing an action under the
APA. It primarily argues that the careful limitations Con-
gress imposed upon the QTA's waiver of sovereign im-
munity are "simply inapposite" to actions in which the
plaintiff advances a different "grievance" to that underly-
ing a QTA suit, *i.e.,* cases in which a plaintiff seeks to
"strip the United States of title to the land . . . not on the
ground that it is his," but rather because "the Secretary's
decision to take land into trust violates a federal statute."
*Ante,* at 7, 10. This analysis is unmoored from the text of
the APA.

Section 702 focuses not on a plaintiff's motivation for
suit, nor the arguments on which he grounds his case, but
only on whether another statute expressly or impliedly
forbids the relief he seeks. The relief Patchak admittedly
seeks—to oust the Government of title to Indian trust
land—is identical to that forbidden by the QTA. Con-
versely, the Court's hypothetical suit, alleging that the
Bradley Property was causing environmental harm, would
not be barred by the QTA. See *ante,* at 6. That is not
because such an action asserts a different "grievance," but
because it seeks different relief—abatement of a nuisance
rather than the extinguishment of title.[2]

―――――――――

[2] The majority claims, *ante,* at 7, n. 3, that this test has "no obvious
limits," but it merely applies the text of §702 (which speaks of "relief,"
not "grievances"). In any event, the majority's hypothetical, *ibid.*,
compares apples to oranges. I do not contend that the APA bars all
injunctive relief involving Indian lands, simply other suits—like this
one—that seek "to adjudicate a disputed title to real property in which
the United States claims an interest." 28 U. S. C. §2409a(a). That

In any event, the "grievance" Patchak asserts is no different from that asserted in *Block*—a case in which we unanimously rejected a plaintiff's attempt to avoid the QTA's restrictions by way of an APA action or the similar device of an officer's suit.[3] That action, like this one, was styled as a suit claiming that the Government's actions respecting land were "'"not within [its] statutory powers."'" 461 U. S., at 281. Cf. *ante,* at 10 ("[Patchak] asserts merely that the Secretary's decision to take land into trust violates a federal statute"). The relief requested was also identical to that sought here: injunctive relief directing the United States to "'cease and desist from . . . exercising privileges of ownership'" over the land in question. 461 U. S., at 278; see also App. 38.

The only difference that the majority can point to between *Block* and this case is that Patchak asserts a weaker interest in the disputed property. But that is no reason to imagine that Congress intended a different outcome. As the majority itself acknowledges, the harm to the United States and tribes when a plaintiff sues to extinguish the Government's title to Indian trust land is identical "whether or not a plaintiff claims to own the land himself." *Ante,* at 12. Yet, if the majority is correct, Congress intended the APA's waiver of immunity to apply to those hypothetical plaintiffs differently. Congress, it suggests, intended to permit anyone to circumvent the QTA's careful

─────────

result is entirely consistent with *Block*—which stated that the APA "specifically confers no 'authority to grant relief if any other statute . . . expressly or impliedly forbids the relief which is sought.'" 461 U. S, at 286, n. 22 (quoting 5 U. S. C. §702).

[3] An officer's suit is an action directly against a federal officer, but was otherwise identical to the kind of APA action at issue here. Compare *Block*, 461 U. S., at 281 (seeking relief because agency official's actions were "'"not within [his] statutory powers"'"), with 5 U. S. C. §706(2)(C) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations").

limitations and sue to force the Government to relinquish Indian trust lands—anyone, that is, except those with the strongest entitlement to bring such actions: those claiming a personal "right, title, or interest" in the land in question. The majority's conclusion hinges, therefore, on the doubtful premise that Congress intended to waive the Government's sovereign immunity wholesale for those like Patchak, who assert an "aesthetic" interest in land, *ante,* at 1, while retaining the Government's sovereign immunity against those who assert a constitutional interest in land—the deprivation of property without due process of law. This is highly implausible. Unsurprisingly, the majority does not even attempt to explain why Congress would have intended this counterintuitive result.

It is no answer to say that the QTA reaches no further than an "ordinary quiet title suit." *Ante,* at 11. The action permitted by §2409a is not an ordinary quiet title suit. At common law, equity courts "permit[ted] a bill to quiet title to be filed only by a party in *possession* [of land] against a defendant, who ha[d] been ineffectually seeking to establish a legal title by repeated actions of ejectment." *Wehrman* v. *Conklin,* 155 U. S. 314, 321–322 (1894) (emphasis added). Section 2409a is broader, requiring neither prerequisite. Moreover, as the majority tells us, see *ante,* at 7, an act to quiet title is "universally understood" as a proceeding "to establish a plaintiff's *title* to land." Black's Law Dictionary 34 (9th ed. 2009) (emphasis added). But §2409a authorizes civil actions in cases in which neither the Government, nor the plaintiff, claims title to the land at issue. See §2409a(d) ("The complaint shall set forth . . . the *right,* title, or *interest* which the plaintiff claims" (emphasis added)).[4] A plaintiff may file suit under §2409a, for

—————

[4] The majority notes that some States permit a broader class of claims under the rubric of "quiet title," and points to the "'wide differences in State statutory and decisional law' on quiet title suits" at the

instance, when he claims only an easement in land, the right to explore an area for minerals, or some other lesser right or interest. See S. Rep. No. 92–575, at 5. Notwithstanding its colloquial title, therefore, the QTA plainly allows suit in circumstances well beyond "bread-and-butter quiet title actions," *ante,* at 3, n. 3.[5]

The majority attempts to bolster its reading by emphasizing an unexpected source within §2409a: the clause specifying that the United States may be sued "'in *a civil action under this section.'"*   Ante,* at 11.   The majority understands this clause to narrow the QTA's scope (and its limitations on the Government's immunity waiver) to quiet title claims only. But "this section" speaks broadly to civil actions "to adjudicate a disputed title to real property in which the United States claims an interest." §2409a.   Moreover, this clause is read most straightforwardly to serve a far more pedestrian purpose: simply to state that a claimant can file "a civil action under this section"—§2409a—to adjudicate a disputed title in which the United States claims an interest. Regardless of how one reads the clause, however, it does not alter the APA's clear command that suits seeking relief forbidden by other statutes are not authorized by the APA. And the QTA forbids the relief sought here: injunctive relief forcing the Government to relinquish title to Indian lands.

Even if the majority were correct that the QTA itself reached only as far as ordinary quiet title actions, that

———————

time of the Act. *Ante,* at 8, n. 4. But that substantial variation only illustrates the artificiality of the majority's claim that the Act only "addresses quiet title actions, as *ordinarily* conceived." *Ante,* at 9, n. 5.

[5] I recognize, of course, that the QTA is titled "[a]n Act to permit suits to adjudicate certain real property quiet title actions." 86 Stat. 1176. But "the title of a statute . . . cannot limit the plain meaning of [its] text." *Trainmen* v. *Baltimore & Ohio R. Co.,* 331 U. S. 519, 528–529 (1947). As explained above, the substance of Congress' enactment plainly extends more broadly than quiet title actions, mirroring the scope of the title proposed by the Government. See *supra,* at 2.

would establish only that the QTA does not expressly
forbid the relief Patchak seeks. The APA, however, does
not waive the Government's sovereign immunity where
any other statute "expressly *or impliedly* forbids the relief
which is sought." 5 U. S. C. §702 (emphasis added). The
text and history of the QTA, as well as this Court's prece-
dent, make clear that the United States intended to retain
its sovereign immunity from suits to dispossess the Gov-
ernment of Indian trust land. Patchak's suit to oust the
Government of such land is therefore, at minimum, im-
pliedly forbidden.[6]

## II

Three consequences illustrate the difficulties today's
holding will present for courts and the Government. First,
it will render the QTA's limitations easily circumvented.
Although those with property claims will remain formally
prohibited from bringing APA suits because of *Block*,
savvy plaintiffs and their lawyers can recruit a family
member or neighbor to bring suit asserting only an "aes-
thetic" interest in the land but seeking an identical prac-
tical objective—to divest the Government of title and
possession. §§2409a(a), (b). Nothing will prevent them from
obtaining relief that the QTA was designed to foreclose.

Second, the majority's holding will frustrate the Gov-
ernment's ability to resolve challenges to its fee-to-trust
decisions expeditiously. When a plaintiff like Patchak
asserts an "aesthetic" or "environmental" concern with a
planned use of Indian trust land, he may bring a distinct
suit under statutes like the National Environmental
Policy Act of 1969 and the Indian Gaming Regulatory Act.
Those challenges generally may be brought within the
APA's ordinary 6-year statute of limitations. Suits to

―――――――――

[6] Because I conclude that sovereign immunity bars Patchak's suit,
I would not reach the question of whether he has standing.

contest the Government's decision to take title to land in trust for Indian tribes, however, have been governed by a different rule. Until today, parties seeking to challenge such decisions had only a 30-day window to seek judicial review. 25 CFR §151.12 (2011); 61 Fed. Reg. 18,082–18,083 (1996). That deadline promoted finality and security—necessary preconditions for the investment and "economic development" that are central goals of the Indian Reorganization Act. *Ante,* at 16.[7] Today's result will promote the opposite, retarding tribes' ability to develop land until the APA's 6-year statute of limitations has lapsed.[8]

Finally, the majority's rule creates substantial uncertainty regarding who exactly is barred from bringing APA claims. The majority leaves unclear, for instance, whether its rule bars from suit only those who "claim any competing interest" in the disputed land in their complaint, *ante,* at 7, or those who could claim a competing interest, but plead only that the Government's title claim violates a federal statute. If the former, the majority's holding would allow Patchak's challenge to go forward even if he had some personal interest in the Bradley Property, so long as his complaint did not assert it. That result is difficult to square with *Block* and *Mottaz.* If the latter, matters are even more peculiar. Because a shrewd plaintiff will avoid referencing her own property claim in her

───────────

[7] Trust status, for instance, is a prerequisite to making lands eligible for various federal incentives and tax credits closely tied to economic development. See, *e.g.,* App. 56. Delayed suits will also inhibit tribes from investing in uses other than gaming that might be less objectionable—like farming or office use.

[8] Despite notice of the Government's intent through an organization with which he was affiliated, Patchak did not challenge the Government's fee-to-trust decision even though the organization did. See *Michigan Gambling Opposition* v. *Kempthorne*, 525 F. 3d 23 (CADC 2008). Instead, Patchak waited to sue until three years after the Secretary's intent to acquire the property was published. App. 35, 39.

complaint, the Government may assert sovereign immunity only if its detective efforts uncover the plaintiff's unstated property claim.   Not only does that impose a substantial burden on the Government, but it creates perverse incentives for private litigants.   What if a plaintiff has a weak claim, or a claim that she does not know about?   Did Congress really intend for the availability of APA relief to turn on whether a plaintiff does a better job of overlooking or suppressing her own property interest than the Government does of sleuthing it out?

As these observations illustrate, the majority's rule will impose a substantial burden on the Government and leave an array of uncertainties.   Moreover, it will open to suit lands that Congress and the Executive Branch thought the "national public interest" demanded should remain immune from challenge.   Congress did not intend either result.

\*     \*     \*

For the foregoing reasons, I would hold that the QTA bars the relief Patchak seeks.  I respectfully dissent.