Opinion by Judge HURWITZ; Concurrence by Judge CHRISTEN; Dissent by Judge CALLAHAN; Dissent by Judge MILAN D. SMITH, JR.; Dissent by Judge KOZINSKI.
OPINION
HURWITZ, Circuit Judge:
In 2001, the United States Department of Agriculture promulgated the “Roadless Rule,” limiting road construction and timber harvesting in national forests. The Department expressly found that exempting the Tongass National Forest from this Rule “would risk the loss of important roadless area [ecological] values.” Just two years later, relying on the identical factual record compiled in 2001, the Department reversed course, finding “[application of the roadless rule to the Tongass ... unnecessary to maintain the roadless values.”
The issue in this case is whether the Department sufficiently explained this dramatically changed finding. Like the district court, we conclude that the Administrative Procedure Act requires a reasoned explanation for this change in course, and affirm the judgment below.
I.
A. The 2001 Roadless Rule
Approximately one-third of National Forest Service lands, some 58.5 million acres, is designated by the Department of Agriculture as inventoried roadless areas. See Special Areas; Roadless Area Conservation, 66 Fed.Reg. 3244, 3245 (Jan. 12, 2001) (to be codified at 36 C.F.R. §§ 294.10-294.14) (the “2001 ROD”). These “large, relatively undisturbed landscapes” have a variety of scientific, environmental, recreational, and aesthetic attributes and characteristics unique to roadless areas, which the Department refers to as “roadless values.” Id. at 3245, 3251. As the 2001 ROD explained, these include healthy watersheds critical for catching and storing water, protecting downstream communities from flooding, providing clean water for domestic and agricultural purposes, and supporting healthy fish and wildlife populations. Id. at 3245. Roadless area attributes also include habitats for threatened and endangered species, space for wilderness recreation, environments for research, traditional cultural properties and sacred sites, and defensive zones against invasive species. Id.
Inventoried roadless lands were historically managed through local- and forest-level plans. Id. at 3246-47. In 2000, citing the “costly and time-consuming appeals and litigation” that plagued this process, id. at 3244, the Department considered a national roadless lands policy that would look at “the “whole picture’ regarding the management of the National Forest System,” id. at 3246-48. The Department undertook to answer two questions when it started this process. The first was whether to prohibit timber harvesting and road construction (or reconstruction) within inventoried roadless areas of our national forests. Id. at 3262. The second question recognized the unique nature of the Tongass National Forest, which, at 16.8 million acres, is the nation’s largest national forest.[1] Id. The *960 issue was whether to exempt the Tongass from the proposed Roadless Rule in whole or in part. Id. at 3262-63. Thus, the Department examined four alternatives for treating the Tongass under the Roadless Rule: applying any new rule to the Tongass with no exceptions (Tongass Not Exempt), excluding the Tongass from a new rule altogether (Tongass Exempt), postponing any decision on the application of a new rule to the Tongass until 2004 (Tongass Deferred), and applying some of the prohibitions of a new rule only to certain parts of the Tongass (Tongass Selected Areas). Id. No other national forest received such special consideration in the Department’s nationwide assessment of the proposed Roadless Rule.
Given the unique importance of the Ton-gass and the many competing interests in its use and management, it was not surprising that thousands of public comments concerning the proposed rule were received, or that the Department gave the Tongass special consideration. Id. at 3248. Approximately 16,000 people attended 187 public meetings, and the Department received more than 517,000 comments on the proposed rule. Id. The 2001 ROD squarely recognized that adopting the Roadless Rule risked significant and negative local economic impact for the Tongass:
With the recent closure of pulp mills and the ending of long-term timber sale contracts, the timber economy of Southeast Alaska is evolving to a competitive bid process. About two-thirds of the total timber harvest planned on the Tongass National Forest over the next 5 years is projected to come from inventoried roadless areas. If road construction were immediately prohibited in inventoried roadless areas, approximately 95 percent of the timber harvest within those areas would be eliminated.
Based on the analysis contained in the [Final Environmental Impact Statement], a decision to implement the rule on the Tongass National Forest is expected to cause additional adverse economic effects to some forest dependent communities ([Final Environmental Impact Statement] Yol. 1, 3-326 to 3-350). During the period of transition, an estimated 114 direct timber jobs and 182 total jobs would be affected. In the longer term, an additional 269 direct timber jobs and 431 total jobs may be lost in Southeast Alaska.
Id. at 3254-55.
In light of these socio-economic concerns, the proposed Roadless Rule suggested the Tongass Deferred option. See Special Areas; Roadless Area Conservation, 65 Fed.Reg. 30,276, 30,277, 30,280-81 (May 10, 2000) (notice of proposed rule-making). But the 2001 ROD expressly found that such an approach “would risk the loss of important roadless area values” in the Tongass. 66 Fed.Reg. at 3254. The 2001 ROD also rejected the Tongass Selected Areas option, finding that even under that more limited approach, “[i]mpor-tant roadless area values would be lost or diminished.” Id. at 3266. Ultimately, the Department adopted a national Roadless Rule prohibiting road construction and timber harvesting in inventoried roadless areas of the National Forest System except for specified “human and environmental protection measures.” Id. at 3263. The Department decided that the Roadless Rule would apply to the Tongass, but with several exceptions designed to mitigate the *961 impacts of the Rule in Southeast Alaska. The exceptions allowed: (1) road construction and reconstruction in certain mineral-leasing areas, (2) timber harvest in areas where roadless characteristics had been substantially altered by road construction or timber harvest since the area was designated an inventoried roadless area but before implementation of the Roadless Rule, and (3) planned timber harvest and road construction in areas where a notice of availability of a draft environmental impact statement had been published in the Federal Register prior to publication of the Roadless Rule. Id. at 3266. The Department estimated that these exceptions would together allow enough continued timber harvest from the Tongass “to satisfy about seven years of estimated market demand.” Id.
B. The Roadless Rule Litigation
Although the Department intended the Roadless Rule to reduce litigation about forest management, see id. at 3244, 3246, that hope was promptly dashed. Litigation over the Roadless Rule began immediately after its adoption. In 2001, an Idaho district judge preliminarily enjoined implementation of the Roadless Rule, citing violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347 (“NEPA”). Kootenai Tribe of Idaho v. Veneman, No. 01-10-N-EJL, 2001 WL 1141275, at *2 (D.Idaho May 10, 2001). This court reversed, finding that plaintiffs had not shown a likelihood of success on their NEPA claim. Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1126 (9th Cir.2002), abrogated on other grounds by Wilderness Soc’y v. U.S. Forest Serv., 630 F.3d 1173, 1178-80 (9th Cir.2011) (en banc). The Roadless Rule took effect when the Kootenai mandate issued in April 2003. See California ex rel. Lockyer v. U.S. Dep’t of Agric., 575 F.3d 999, 1007 (9th Cir.2009) (describing history of the Roadless Rule).
The State of Alaska also challenged the Roadless Rule soon after its adoption. The State’s complaint, filed in the District of Alaska in 2001, claimed that the promulgation of the Roadless Rule violated NEPA, the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706 (“APA”), the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101-3233 (“ANIL-CA”), the Tongass Timber Reform Act, Pub.L. No. 101-626, 104 Stat. 4426 (1990) (codified as amended in scattered sections of 16 U.S.C.) (“TTRA”), and other federal statutes. Complaint, Alaska v. U.S. Dep’t of Agric., No. 3:01-cv-00039-JKS (D. Alaska Jan. 31, 2001), ECF No. 1; see also Organized Vill. of Kake v. U.S. Dep’t of Agric., 776 F.Supp.2d 960, 964 (D.Alaska 2011) (describing this litigation). The case settled, and Alaska’s complaint was dismissed.[2] Organized Vill., 776 F.Supp.2d at 964.
Four months after this court decided Kootenai, the Roadless Rule was permanently enjoined by a Wyoming district court that found the rule violated both NEPA and the Wilderness Act, 16 U.S.C. §§ 1131-1136. Wyoming v. U.S. Dep’t of Agric., 277 F.Supp.2d 1197, 1239 (D.Wyo.2003), vacated, Wyoming v. U.S. Dep’t of Agric., 414 F.3d 1207, 1211, 1214 (10th Cir.2005). While that ruling was on appeal, the Department promulgated the “Special Areas; State Petitions for Inventoried Roadless Area Management” rule *962 (the “State Petitions Rule”). 70 Fed.Reg. 25,654 (May 13, 2005) (to be codified at 36 C.F.R. §§ 294.10-294.18). The State Petitions Rule replaced the Roadless Rule with a process under which the “Governor of any State or territory that contains National Forest System lands” could “petition the Secretary of Agriculture to promulgate regulations establishing management requirements for all or any portion of National Forest System inventoried roadless areas within that State or territory.” Id. at 25,661. In light of the new rule, the Tenth Circuit dismissed the Department’s appeal from the Wyoming district court judgment as moot and vacated the judgment. Wyoming, 414 F.3d at 1211, 1214.
A year later, however, a California district court set aside the State Petitions Rule, finding it invalid under NEPA and the Endangered Species Act, 16 U.S.C. §§ 1531-1544; the district court therefore reinstated the Roadless Rule. California ex rel. Lockyer v. U.S. Dep’t of Agric., 459 F.Supp.2d 874, 909, 912, 919 (N.D.Cal.2006). This court affirmed. Lockyer, 575 F.3d at 1021. In 2008, a Wyoming district court again permanently enjoined the Roadless Rule. Wyoming v. U.S. Dep’t of Agric., 570 F.Supp.2d 1309, 1355 (D.Wyo.2008), rev’d, Wyoming v. U.S. Dep’t of Agric., 661 F.3d 1209, 1272 (10th Cir.2011). In 2011, the Tenth Circuit once again reversed. Wyoming, 661 F.3d at 1272.
C. The Tongass Exemption
In return for Alaska’s dismissal of its 2001 suit challenging the Roadless Rule, the Department agreed to publish (but not necessarily to adopt) a proposed rule, the “Tongass Exemption,” to “temporarily exempt the Tongass from the application of the roadless rule” as well as an advanced notice of proposed rulemaking to permanently exempt the Tongass and another Alaska national forest from the Roadless Rule. See Special Areas; Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska, 68 Fed.Reg. 41,865, 41,866 (Jul. 15, 2003) (notice of proposed rulemaking). In December of 2003, the Department issued a record of decision (the “2003 ROD”) promulgating the final Tongass Exemption, the “Special Areas; Roadless Conservation; Applicability to the Tongass National Forest, Alaska” rule. 68 Fed.Reg. 75,136 (Dec. 30, 2003) (to be codified at 36 C.F.R. § 294.14). The 2003 ROD expressly found that “the overall de-cisionmaking picture” was not “substantially different” from when the 2001 ROD was promulgated, id. at 75,141, and that public comments about the Tongass Exemption “raised no new issues ... not already fully explored” in the earlier rule-making, id. at 75,139. Thus, the Department relied on the 2001 Roadless Rule Final Environmental Impact Statement (“Roadless Rule FEIS”), rather than preparing a new one. Id. at 75,136, 75,141.
The 2003 ROD adopted the Tongass Exempt Alternative identified in the 2001 ROD, thus returning the Tongass to management through a local forest plan, the Tongass Forest Plan. Id. at 75,136. Contrary to the 2001 ROD, the 2003 ROD concluded “[application of the roadless rule to the Tongass is unnecessary to maintain the roadless values of these areas,” id. at 75,137, which the Department found were already “well protected by the Tongass Forest Plan,” id. at 75,144.
D. The Procedural History of This Case
In 2009, the Organized Village of Kake and others (collectively, the “Village”) filed this suit in the District of Alaska, alleging that the Tongass Exemption violated NEPA and the APA. See Organized Vill., 776 F.Supp.2d at 967. The State of Alaska intervened as a party-defendant. Id. at 961. The district court granted summary judgment to the Village, finding the *963 promulgation of the Tongass Exemption violated the APA, 5 U.S.C. § 706(2)(A), because “the Forest Service provided no reasoned explanation as to why the Ton-gass Forest Plan protections it found deficient in [2001], were deemed sufficient in [2003].” Id. at 974, 977. The court thus vacated the Tongass Exemption and reinstated application of the Roadless Rule to the Tongass.[3] Id. at 977.
The Department declined to appeal. See Organized Vill. of Kake v. U.S. Dep’t of Agric., 746 F.3d 970, 973 (9th Cir.2014). Alaska, however, did appeal, and a divided three-judge panel of this court reversed the district court’s APA ruling and remanded for consideration of the Village’s NEPA claim.[4] Id. at 973, 980. A majority of the nonrecused active judges on this court then voted to grant the Village’s petition for rehearing en banc. See Organized Vill. of Kake v. U.S. Dep’t of Agric., 765 F.3d 1117 (9th Cir.2014).
II.
A. Jurisdiction
We begin, as we did in Kootenai, by examining “whether the intervenor[ ] may defend the government’s alleged violations of ... the APA when the federal defendants have decided not to appeal.” 313 F.3d at 1107. Although the Village does not challenge Alaska’s standing, that silence does not excuse us from determining whether we have appellate jurisdiction. United Investors Life Ins. Co. v. Waddell & Reed Inc., 360 F.3d 960, 966-67 (9th Cir.2004).[5]
“[I]ntervenors are considered parties entitled ... to seek review,” but “an intervenor’s right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III.” Diamond v. Charles, 476 U.S. 54, 68, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). To establish Article III standing, a party must demonstrate “injury in fact,” causation, and redressability. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). When the original defendant does not appeal, “the test is whether the intervenor’s interests have been adversely affected by the judgment.” Didrickson v. U.S. Dep’t of Interior, 982 F.2d 1332, 1338 (9th Cir.1992).
Under the National Forest Receipts program, Alaska has a right to twenty-five percent of gross receipts of timber sales from national forests in the State. See 16 U.S.C. § 500. Accordingly, from 1970 through 2001, Alaska received more than $93 million in Tongass receipts. The permitted amount of timber harvesting in the Tongass is directly affected by the Tongass Exemption. See 2001 ROD, 66 Fed.Reg. at 3270 (finding that under the Roadless Rule, “[h]arvest effects on the Tongass National Forest will be reduced about 18 percent in the short-term” and “about 60 percent” in the long-term). The effect of the Roadless Rule on Alas *964 ka’s statutory entitlement to timber receipts means that Alaska has an interest in the judgment, Didrickson, 982 F.2d at 1338, sufficient to establish Article III standing, see Watt v. Energy Action Educ. Found., 454 U.S. 151, 160-61, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981).
Our dissenting colleague argues that Article III standing is absent because “Congress did not intend to legislate standing” for a state under 16 U.S.C. § 500. This argument misses the mark. As the Supreme Court has recently made clear, whether Congress created a private cause of action in legislation is not a question of Article III standing. See Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 1386-88 & n. 4, 188 L.Ed.2d 392 (2014). Notwithstanding that courts sometimes have mistakenly referred to this inquiry as involving “prudential standing,” the Court has made plain that it “does not implicate subject-matter jurisdiction, i.e., the court’s, statutory or constitutional power to adjudicate the case.” Id. at 1387 & n. 4 (internal quotation marks omitted) (noting that “prudential standing” is a “misnomer”). Here, Alaska does not pursue a claim under the National Forest Receipts program. Rather, this is an APA action initiated by the Village challenging the Tongass Exemption. In such an action, we apply the familiar “zone of interests” test. Id. at 1388-89. The Supreme Court has emphasized,
in the APA context, that the test is not especially demanding. In that context we have often conspicuously included the word “arguably” in the test to indicate that the benefit of any doubt goes to the plaintiff, and have said that the test forecloses suit only when a plaintiffs interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue. That lenient approach is an appropriate means of preserving the flexibility of the APA’s .omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review. We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes.
Id. at 1389 (citations and internal quotation marks omitted).
There can be no doubt that the Village more than amply met the forgiving “zone of interests” test when it instituted this APA action. That resolves the issue, because “[a]n intervenor’s standing to pursue an appeal does not hinge upon whether the intervenor could have sued the party who prevailed in the district court.” Didrickson, 982 F.2d at 1338.[6]
Of course, Alaska must also have Article III standing. Thus, the only issue really before us is whether the judgment below threatens Alaska with an injury in fact that gives the State a “stake in defending ... enforcement” of the Tongass Exemp *965 tion sufficient to satisfy Article III. Hollingsworth v. Perry, — U.S. —, 133 S.Ct. 2652, 2663, 186 L.Ed.2d 768 (2013) (internal quotation marks omitted). In this respect, contrary to the dissent, Energy Action Educational Foundation is on all fours. Under the Outer Continental Shelf Lands Act Amendments of 1978 (“OCS”), the federal government was required to share revenues from a federal OCS lease with a state owning adjoining portions of an oil and gas pool. Energy Action Educ. Found., 454 U.S. at 160-61, 102 S.Ct. 205. When California challenged the bidding system used for awarding federal leases, the Secretary of the Interior disputed the State’s standing. Id. In finding that California alleged a potential injury sufficient to establish Article III standing, the Court relied expressly on the State’s right to revenues under the 1978 OCS amendments:
The 1978 Amendments require the Federal Government to turn over a fair share of the revenues of an OCS lease to the neighboring coastal State whenever the Federal Government and the State own adjoining portions of an OCS oil and gas pool. California thus has a direct financial stake in federal OCS leasing off the California coast. In alleging that the bidding systems currently used by the Secretary of the Interior are incapable of producing a fair market return, California clearly asserts the kind of distinct and palpable injury that is required for standing.
Id. at 160-61, 102 S.Ct. 205 (citations and internal quotation marks omitted).[7]
The royalties due California under the OCS are indistinguishable for Article III purposes from the fractional timber receipts due Alaska under the National Forest Receipts program. It is not disputed that reinstatement of the Roadless Rule in the Tongass will limit timbering and thereby reduce Alaska’s statutory entitlement to fractional receipts. Alaska’s claimed injury is thus precisely the same kind of “injury in fact” alleged by California with respect to the federal lease bidding system — loss of funds promised under federal law — and satisfies Article Ill’s standing requirement.[8]
To be sure, Alaska and its government subdivisions have elected since 2001 to receive payments under the Secure Rural Schools and Community Self-Determination Act of 2000, Pub.L. No. 106-393, 114 Stat. 1607, and successor legislation, in lieu of the fractional payments.[9] But, Congress’s current decision to protect beneficiaries of the National Forest Receipts *966 program against declines in timbering revenues does not vitiate Alaska’s Article III standing to challenge the reinstatement of the Roadless Rule. The Rule directly affects the size of Alaska’s statutory entitlement to receipts from timbering, whether or not Congress chooses in any year to hold the state harmless against those losses, just as a plaintiff with an insurance policy has standing to sue a defendant who has damaged his home, even though in the end the insurer (or even the homeowner’s uncle) has agreed to indemnify the homeowner for all losses.[10]
B. The APA claim
1. The APA Requirements for a Change of Agency Policy
The APA requires a court to “hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). Agency action is “arbitrary and capricious if the agency has ... offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Motor Vehicle Mfrs. Ass’n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). “Unexplained inconsistency” between agency actions is “a reason for holding an interpretation to be an arbitrary and capricious change.” Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).
The Supreme Court addressed the application of the APA to agency policy changes in FCC v. Fox Television Stations, Inc., 556 U.S. 502, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). In Fox, the Court held that a policy change complies with the APA if the agency (1) displays “awareness that it is changing position,” (2) shows that “the new policy is permissible under the statute,” (3) “believes” the new policy is better, and (4) provides “good reasons” for the new policy, which, if the “new policy rests upon factual findings that contradict those which underlay its prior policy,” must include “a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy.” Id. at 515-16, 129 S.Ct. 1800 (emphasis omitted).
Fox involved the FCC’s decision to treat isolated uses of non-literal profanity in television broadcasts as indecency, a reversal of agency policy. Id. at 508-10, 129 S.Ct. 1800. Because the FCC had not based its prior policy on factual findings, but rather on its reading of Supreme Court precedent, the Fox majority did not explore the kind of “reasoned explanation” necessary to justify a policy change that rested on changed factual findings. See id. at 538, 129 S.Ct. 1800 (Kennedy, J., concurring). But, Justice Kennedy, whose concurrence provided the fifth vote in the Fox 5^4 majority, plumbed this issue in his opinion. See id. at 535-39, 129 S.Ct. 1800.
As a paradigm of the rule that a policy change violates the APA “if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so,” Justice Kennedy cited State Farm. Id. at 537, 129 S.Ct. 1800. That case involved congressional direction to an agency to issue regulations for “motor vehicle safety.” Id. (quoting State Farm, 463 U.S. at 33, 103 S.Ct. 2856). The agency issued a regulation requiring cars to have airbags or automatic seatbelts, find *967 ing that “these systems save lives.” Id. at 537-38, 129 S.Ct. 1800 (citing State Farm, 463 U.S. at 35, 37, 103 S.Ct. 2856). After a change in presidential administrations, however, the agency rescinded the regulation, never addressing its previous findings. Id. at 538, 129 S.Ct. 1800 (citing State Farm, 463 U.S. at 47-48, 103 S.Ct. 2856). As Justice Kennedy noted, the “Court found the agency’s rescission arbitrary and capricious because the agency did not address its prior factual findings.” Id. (citing State Farm, 463 U.S. at 49-51, 103 S.Ct. 2856).
The central issue in this case is whether the 2003 ROD rests on factual findings contradicting those in the 2001 ROD, and thus must contain the “more substantial justification” or reasoned explanation mandated by Fox. Perez v. Mortg. Bankers Ass’n, — U.S. —, 135 S.Ct. 1199, 1209, 191 L.Ed.2d 186 (2015). We conclude that the 2003 ROD falls short of these APA requirements.
2. The Tongass Exemption Violated the APA
After compiling a detailed factual record, the Department found in the 2001 ROD that “the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to [southeast Alaska] communities” from application of the Roadless Rule. 66 Fed.Reg. at 3255. On precisely the same record, the 2003 ROD instead concluded that the “the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits” of the Roadless Rule. 68 Fed.Reg. at 75,141. Alaska contends, and we agree, that the 2003 ROD is a change in policy.
We also agree with Alaska that the 2003 ROD complies with three of the Fox requirements. First, the Department displayed “awareness that it is changing position.” Fox, 556 U.S. at 515, 129 S.Ct. 1800. The 2003 ROD acknowledges that the Department rejected the Tongass Exemption in 2001 and recognizes that it is now “treating the Tongass differently.” 68 Fed.Reg. at 75,139. Second, the 2003 ROD asserts that “the new policy is permissible” under the relevant statutes, AN-ILCA and TTRA. Fox, 556 U.S. at 515, 129 S.Ct. 1800; 68 Fed.Reg. at 75,142. Third, we assume the Department “believes” the new policy is better because it decided to adopt it. Fox, 556 U.S. at 515, 129 S.Ct. 1800 (emphasis omitted).
It is the Department’s compliance with the fourth Fox requirement, that it give “good reasons” for adopting the new policy, upon which this case turns. Id. The 2003 ROD explicitly identifies the Department’s reasons for “Going Forward With This Rulemaking” as “(1) serious concerns about the previously disclosed economic and social hardships that application of the rule’s prohibitions would cause in communities throughout Southeast Alaska, (2) comments received on the proposed rule, and (3) litigation over the last two years.” 68 Fed.Reg. at 75,137. We examine below whether these constitute “good reasons” under the APA, and whether a factual finding contrary to the findings in the 2001 ROD underlays the Department’s reasoning.
i. Socioeconomic Concerns
The 2003 ROD explains the Department’s reversal of course as arising out of concern about “economic and social hardships that application of the [roadless] rule’s prohibitions would cause in communities throughout Southeast Alaska.” Id. Those concerns were not new. In both the 2001 and 2003 RODs, the Department acknowledged the “unique” socioeconomic consequences of the Roadless Rule for the timber-dependent communities of south *968 east Alaska. See id. at 75,139; 2001 ROD, 66 Fed.Reg. at 3266. For this reason, the Roadless Rule included special mitigation measures — not added for any other national forest — allowing certain ongoing timber and road construction projects in the Ton-gass to move forward. 2001 ROD, 66 Fed. Reg. at 3266. Moreover, both RODs incorporated potential job loss analysis from the Roadless Rule FEIS. See 2003 ROD, 68 Fed.Reg. at 75,137; 2001 ROD, 66 Fed.Reg. at 3255.
We do not question that the Department was entitled in 2003 to give more weight to socioeconomic concerns than it had in 2001, even on precisely the same record. “Fox makes clear that this kind of reevaluation is well within' an agency’s discretion.” Nat’l Ass’n of Home Builders v. EPA, 682 F.3d 1032, 1038 (D.C.Cir.2012). There was a change in presidential administrations just days after the Roadless Rule was promulgated in 2001. Elections have policy consequences. But, State Farm teaches that even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation.
That is precisely what happened here. The 2003 ROD did not simply rebalance old facts to arrive at the new policy. Rather, it made factual findings directly contrary to the 2001 ROD and expressly relied on those findings to justify the policy change. The 2001 ROD explicitly found that wholly exempting the Tongass from the Roadless Rule and returning it to management under the Tongass Forest Plan “would risk the loss of important roadless area values,” 66 Fed.Reg. at 3254, and that roadless values would be “lost or diminished” even by a limited exemption, id. at 3266. The 2003 ROD found in direct contradiction that the Roadless Rule was “unnecessary to maintain the roadless values,” 68 Fed.Reg. at 75,137, and “the roadless values in the Tongass are sufficiently protected under the Tongass Forest Plan,” id. at 75,138.
There can be no doubt that the 2003 finding was a critical underpinning of the Tongass Exemption. The 2003 ROD states that “[t]he Department has concluded that the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits because the Tongass Forest Plan adequately provides for the ecological sustainability of the Ton-gass.” Id. at 75,141-42 (emphasis added). The 2003 ROD also makes plain that “[t]his decision reflects the facts ... that roadless values are plentiful on the Ton-gass and are well protected by the Ton-gass Forest Plan. The minor risk of the loss of such values is outweighed by the by the more certain socioeconomic costs of applying the roadless rule’s prohibitions to the Tongass.” Id. at 75,144.
Thus, contrary to the contentions of both Alaska and dissenting colleagues, this is not a case in which the Department — or a new Executive — merely decided that it valued socioeconomic concerns more highly than environmental protection. Rather, the 2003 ROD rests on the express finding that the Tongass Forest Plan poses only “minor” risks to roadless values; this is a direct, and entirely unexplained, contradiction of the Department’s finding in the 2001 ROD that continued forest management under precisely the same plan was unacceptable because it posed a high risk to the “extraordinary ecological values of the Tongass.” 66 Fed.Reg. at 3254. The Tongass Exemption thus plainly “rests upon factual findings that contradict those which underlay its prior policy.” Fox, 556 U.S. at 515, 129 S.Ct. 1800. The Department was required to provide a “reasoned explanation ... for disregarding” the “facts and circumstances” that underlay its previous decision. Id. at 516, 129 S.Ct. 1800; Perez, 135 S.Ct. at 1209. It did not.
*969 Consistent with Fox, we have previously held that unexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA. In Humane Society of the United States v. Locke, we confronted a determination by the National Marine Fisheries Service that sea lions posed a “significant negative impact” on fish populations, and could therefore be “lethally removed.” 626 F.3d 1040, 1045-46 (9th Cir.2010). The agency had made four previous findings, however, that comparable or greater dangers to similar fish populations would not have a significant adverse impact. Id. at 1048. We found that the APA required the agency to provide a “rationale to explain the disparate findings.” Id. at 1049 (citing Fox, 556 U.S. 502, 129 S.Ct. 1800).
The same result is mandated here. The 2003 ROD does not explain why an action that it found posed a prohibitive risk to the Tongass environment only two years before now poses merely a “minor” one. The absence of a reasoned explanation for disregarding previous factual findings violates the APA. “An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.” Fox, 556 U.S. at 537, 129 S.Ct. 1800 (Kennedy, J., concurring).
Of course, not every violation of the APA invalidates an agency action; rather, it is the burden of the opponent of the action to demonstrate than an error is prejudicial. Jicarilla Apache Nation v. U.S. Dep’t of Interior, 613 F.3d 1112, 1121 (D.C.Cir.2010); see also Shinseki v. Sanders, 556 U.S. 396, 409, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009) (“This Court has said that the party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.” (internal quotation marks omitted)).
But the required demonstration of prejudice is “not ... a particularly onerous requirement.” Shinseki, 556 U.S. at 410, 129 S.Ct. 1696. “If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further.” Jicarilla, 613 F.3d at 1121. Because the Department’s 2003 finding that the threat to the environment from the Tongass Exemption had now become “minor” is the centerpiece of its policy change, the absence of a reasoned explanation for that new factual finding is not harmless error. See Cal. Wilderness Coal. v. U.S. Dep’t of Energy, 631 F.3d 1072, 1091-92 (9th Cir.2011) (applying Shinseki prejudice review to rulemaking). The Tongass Exemption therefore cannot stand.
ii. The Department’s Other Rationales
Although we conclude that the Tongass Exemption is invalid because the Department failed to provide a reasoned explanation for contradicting the findings in the 2001 ROD, we also briefly consider the two other rationales offered by the Department. These rationales do not rest on factual findings contrary to the 2001 ROD, but neither withstands even the forgiving general requirement that the proffered reason for agency action not be “implausible.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856.
The second of the three reasons given by the Department in the 2003 ROD for promulgating the Tongass Exemption was “comments received on the proposed rule.” 68 Fed.Reg. at 75,137. But, the 2003 ROD expressly conceded that these “comments raised no new issues” beyond those “already fully explored in the [Roadless Rule FEIS].” Id. at 75,139. It is implausible that comments raising “no new issues” regarding alternatives “already fully explored” motivated the adoption of the final Roadless Rule.
*970 The third rationale for the Tongass Exemption, “litigation over the last two years,” id. at 75,137, fares no better. The 2003 ROD states that “[a]dopting this final rule reduces the potential for conflicts regardless of the disposition of the various lawsuits” over the Roadless Rule. Id. at 75,138. Alaska candidly conceded in its opening brief that the Tongass Exemption “obviously will not remove all uncertainty about the validity of the Roadless Rule, as it is the subject of a nationwide dispute and ... nationwide injunctions.” These other lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for the Alaska forest would affect them. And, the Department could not have rationally expected that the Tongass Exemption would even have brought certainty to litigation about this particular forest. It predictably led to this lawsuit, and did. not even prevent a separate attack by Alaska on the Roadless Rule itself.[11] At most, the Department deliberately traded one lawsuit for another.
C. Remedy
“ ‘Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid.’ ” Paulsen v. Daniels, 413 F.3d 999, 1008 (9th Cir.2005) (quoting Idaho Farm Bureau Fed’n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir.1995)); see 5 U.S.C. § 706(2)(A) (“The reviewing court shall ... set aside'agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....”). “The effect of invalidating an agency rule is to reinstate the rule previously in force.” Paulsen, 413 F.3d at 1008. A district court’s reinstatement of a prior rule is reviewed for abuse of discretion. Lockyer, 575 F.3d at 1011, 1019-20.
Alaska argues, however, that because the remedy for an invalid rule is not the reinstatement of another invalid rule, see Paulsen, 413 F.3d at 1008, the district court abused its discretion reinstating the Roadless Rule because that Rule had been enjoined by the Wyoming district court both when the Tongass Exemption was promulgated and when the judgment below was entered. But, wholly aside from the obvious conflict between the first Wyoming district court judgment and our later opinion in Lockyer, 575 F.3d 999, the argument is of no avail. The Tenth Circuit vacated both Wyoming district court injunctions. See Wyoming, 661 F.3d at 1272; Wyoming, 414 F.3d at 1214. The Roadless Rule therefore remains in effect and applies to the Tongass.
III.
We AFFIRM the judgment of the district court.

. The Tongass is vitally important to the economy of Southeast Alaska; it supports significant timber and mining activity as well as commercial and recreational fishing, hunting, *960 recreation, and tourism. The Tongass is also part of the Pacific coast ecoregion, which encompasses one fourth of the world's coastal temperate rainforests. Id. at 3254. The Ton-gass has a very high degree of ecosystem health, and a higher percentage of inventoried roadless acreage than any Forest Service region in the contiguous United States.

. Alaska again challenged the validity of the Roadless Rule in 2011, this time in the District of Columbia. The district court found the action barred by the statute of limitations. Alaska v. U.S. Dep’t of Agric., 932 F.Supp.2d 30, 33-34 (D.D.C.2013). The D.C. Circuit reversed, holding that the limitations period had reset when the Roadless Rule was reinstated in 2006. Alaska v. U.S. Dep't of Agric., 772 F.3d 899, 900 (D.C.Cir.2014). This litigation remains pending.

. Because the court found the Tongass Exemption invalid under the APA, it did not reach the Village’s NEPA claim. Organized Vill., 776 F.Supp.2d at 976.

. The Alaska Forest Association also intervened below, but did not appeal, instead filing a brief as amicus curiae. Amicus Brief, Organized Vill., No. 11-35517 (9th Cir. Nov. 1, 2011), ECF No. 19.

.The D.C. Circuit did not question Alaska's standing in the litigation before that court about the 2001 ROD. Alaska, 772 F.3d at 899-900.

. Even if we were required to determine whether Alaska satisfied the zone of interest test in this action, the answer would be the same. The State’s interests in timber harvesting, road construction, and economic development are directly impacted by the Tongass Exemption, and are extensively discussed in the 2003 ROD. See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, — U.S. —, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (explaining that APA standing requires only that a party’s interests be “marginally” related to the challenged action).

. Contrary to the dissent, the Court did not rely on California’s ownership of adjacent oil deposits in finding a sufficient injury to establish Article III standing. Although the Court properly noted that the OCS required the Secretary "to use the best bidding systems and thereby assure California a fair return for its resources,” Energy Action Educ. Found., 454 U.S. at 161, 102 S.Ct. 205, it did so when analyzing causation and redressability after it had already found that California’s right to statutory payment established the requisite injury in fact.

. The dissent correctly does not contest that the causation and redressability prongs of Article III standing are satisfied here.

.The Secure Rural Schools Act was reauthorized numerous times before it briefly expired in 2014. See U.S. Troop Readiness, Veterans’ Care, Katrina Recovery, and Iraq Accountability Appropriations Act § 5401, Pub.L. No. 110-28, 121 Stat. 112 (2007); Emergency Economic Stabilization Act § 601, Pub.L. No. 110-343, 122 Stat. 3765 (2008); Moving Ahead for Progress in the 21st Century Act § 100101, Pub.L. No. 112-141, 126 Stat. 405 (2012); Helium Stewardship Act of 2013 § 10(a), Pub.L. No. 113-40, 127 Stat. 534 (2013). The Secure Rural Schools Act was reauthorized for two years on April 27, 2015. See Medicare Access and CHIP Reauthorization Act § 524, Pub.L. No. 114-10, 129 Stat. 87 (2015).

. Because the Roadless Rule’s impact on Alaska’s right to fractional receipts under the National Forest Receipts program suffices to establish Article III injury in fact, we need not consider other possible bases for Article III standing.

. The settlement of Alaska’s 2001 suit against the Department required the department to promulgate an advance notice of proposed rulemaking to permanently exempt several national forests in Alaska from the Roadless Rule; the State's concerns with the Roadless Rule thus extend beyond the Tongass. See 2003 ROD, 68 Fed.Reg. at 75,136.